IN RE INTEREST OF HOCHSTETLER, CHILDREN UNDER 18
YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. BEVERLY J. (PAT)
HOCHSTETLER, APPELLANT.
339 N.W.2d 916

Filed November 4, 1983. No. 83-240.

Earl D. Ahlschwede of Ahlschwede & Truell, for appellant.

Charles R. Maser, Greeley County Attorney, for appellee.

Robert E. Wheeler, guardian ad litem.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

The principal issue presented by this appeal is whether, as articulated by the juvenile court judge, the State may interfere in the relationship between a mother and her children by virtue of the former's eccentricity. The courts below have answered affirmatively. We conclude otherwise. We therefore reverse the judgment of the District Court which affirmed placement of custody by the juvenile court in the Nebraska Department of Public Welfare, with physical possession of the children in a foster home, and order the case dismissed.

In its third amended petition the State sought to terminate the parental rights of the appellant, Beverly J. (Pat) Hochstetler, based upon an allegation

that she was mentally ill within the meaning of then Neb. Rev. Stat. § 43-209(5) (Reissue 1978). That statute provided that parental rights may be terminated when such action is found to be in the best interests of the child and it appears that the parents are unable to discharge parental responsibilities because of mental illness or deficiency, and there are reasonable grounds to believe that such condition will continue for a prolonged, indeterminate period. The petition also alleged that the three Hochstetler children were within the definitions of then Neb. Rev. Stat. § 43-202(1) and (2)(b), (c), and (e) (Reissue 1978), and, therefore, their custody should be awarded to the Nebraska Department of Public Welfare under then Neb. Rev. Stat. § 43-208 (Reissue 1978). The aforesaid portions of then § 43-202, in pertinent part, provided: "The juvenile court in each county . . . shall have jurisdiction as follows:

"(1) Exclusive original jurisdiction as to any child under the age of eighteen years, who is homeless or destitute, or without proper support through no fault of his parent, guardian, or custodian;

"(2) Exclusive original jurisdiction as to any child under the age of eighteen years . . . (b) who lacks proper parental care by reason of the fault or habits of his parent, guardian, or custodian; (c) whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such child; . . . or (e) who is in a situation or engages in an occupation dangerous to life or limb or injurious to the health or morals of such child."

Then § 43-208 provided, among other things, that when a child under the age of 18 shall be adjudged to be one defined in subdivision (1) or (2) of § 43-202, such child may be committed to the care and custody of the Department of Public Welfare.

The courts below determined that although Mrs. Hochstetler did not fit the definition of then

§ 43-209(5), the children fell within the provisions of then § 43-202(2)(c) and (e).

In reviewing this matter we bear in mind that an appeal of a juvenile proceeding to this court is heard de novo upon the record, but that the findings of fact of the juvenile court will be accorded great weight because it both heard and observed the parties and witnesses. *In re Interest of Spradlin*, 214 Neb. 834, 336 N.W.2d 563 (1983); *In re Interest of Fant*, 214 Neb. 692, 335 N.W.2d 314 (1983); *In re Interest of Spradlin*, 210 Neb. 734, 317 N.W.2d 59 (1982).

By such a review we find the relevant facts to be that on May 8, 1981, Mrs. Hochstetler was arrested, charged, and eventually convicted of exercising control over property owned by another. ' Her conviction was affirmed by this court in *State v. Hochstetler*, 214 Neb. 482, 334 N.W.2d 455 (1983). In connection with her arrest she was held in jail for 20 days. During that time her children were taken into custody by the Department of Public Welfare. When Mrs. Hochstetler was released from jail on May 28, 1981, the Department of Public Welfare prepared to release the children to her. The three children, Jo Hannah (age 15 at the time), Christopher (then age 13), and John (then age 8), were brought from their foster home in Custer County to that county's welfare office. Upon their arrival at that office the two older children expressed their unhappiness at the imminent reunion with their mother. On that basis a caseworker placed a telephone call to the Greeley County Court. The county judge, in his capacity as the juvenile judge, then directed that the children remain in the custody of the Department of Public Welfare. Subsequently, this action was commenced.

Mrs. Hochstetler is, to say the least, a highly eccentric person. Even her heritage is in dispute. She claims to be of Native American extraction of the Kwakiutl Tribe. She has so told her children and encouraged them to take pride in the fact. Her brother

testified that his sister's claim of such heritage is not true. We are not certain whom to believe in this regard.

Mrs. Hochstetler has told her children that she was involved in military intelligence matters, operating as an agent active in foreign espionage. There is evidence that she has at various times claimed to have been imprisoned in the Soviet Union along with Boris Pasternak. At trial she testified that she had been employed with the military but refused to disclose details of that employment. She has told other persons that she owned and was tending a herd of buffalo. Such was not the case.

She has told her children that one Lester Hochstetler was their father and that he was killed in Vietnam. In 1975 or 1976 her two older children discovered that John Kinzie was their true father. They confronted their mother, who then admitted the truth of the matter.

Mrs. Hochstetler has claimed to her children to have some sort of supernatural powers, due to her Indian heritage, which give her the ability to repair television sets, ripple water, and change the color of objects by merely gazing at them.

Mrs. Hochstetler is a prime example of De Tocqueville's characterization of the American people as a litigious one, and apparently is willing to institute legal proceedings against anyone she considers to have infringed upon her legal rights.

While the evidence is overwhelming that Mrs. Hochstetler is strikingly out of the ordinary, it is just as overwhelming that she has consistently attempted to discharge, and for the most part has succeeded in discharging, her duties as a parent to her three children.

Mrs. Hochstetler is permanently disabled and unable to work. She has supported her family on approximately $450 per month received from various governmental agencies, and food stamps. Except for a short time in 1979, after she was evicted, she

has provided her children with a home in which to live.

Testimony was elicited that occasionally, near the end of the month, the supply of food in her household would run short. However, there never was a time she or the children were without food. At their house in Scotia, Nebraska, the heat was turned down at times in order to conserve fuel. On a few occasions her propane tank would run dry.

Physicians have examined the children and found their health to be problem-free except for an ulcer condition suffered by Jo Hannah. Doctors retained by the Department of Public Welfare state that this ulcer condition is a result of stress caused by her mother's conduct. Jo Hannah characterizes the problem with her mother as disputes concerning clothing, makeup, religion, politics, money, and school friends. Mrs. Hochstetler and Jo Hannah both engaged in counseling to alleviate the stress in their relationship and were seeing a counselor regularly up to the time of her arrest. Jo Hannah's ulcer condition was brought under control shortly after its diagnosis.

It is clear that the physical needs of her children were being met by Mrs. Hochstetler. There is no evidence of any physical abuse, although on one occasion Mrs. Hochstetler allegedly slapped her daughter.

Mrs. Hochstetler has been diagnosed as having a paranoid personality disorder, which is characterized by an overwhelming sense of suspicion of the motivations of those around her. The State has alleged that this disorder has contributed to Mrs. Hochstetler's frequent changes of residence, which have resulted in the severing of her family's emotional ties to the community at large. The evidence shows, however, that the children have been well dressed and clean, have attended school regularly but not without absences, and have received above average grades in their courses. The children, es-

pecially Jo Hannah, have been active in extracurricular activities. They are respectful, intelligent, and articulate. They have a good social and moral sense, as illustrated by Christopher's and Jo Hannah's responses to their mother when she committed the acts which form the basis for our opinion in *State v. Hochstetler, supra.* They told her that if she got caught and they had to testify, they would tell the truth.

There is also testimony, small wonder, by a social worker that the suspicions of Mrs. Hochstetler have in part been kindled by the State's efforts to take her children from her.

Much is made by the State of letters sent by Mrs. Hochstetler to her children while they have been in the care of the Department of Public Welfare. In her letters Mrs. Hochstetler places the blame for these problems on Jo Hannah. She also tells her children that this custody matter has adversely affected the health of their grandmother, the truth of which is unclear from the evidence.

In summary, the record establishes that Mrs. Hochstetler is an intelligent, haughty, articulate, aggressive, and abrasive woman who has been convicted of a crime. She refuses to document certain aspects of her background, and claims unlikely powers. She appears to delight in confronting and tweaking the bureaucracy which both sustains and torments her. Her outlandish behavior embarrasses her children. The record also establishes, however, that she loves and, given the opportunity, adequately cares for them.

Notwithstanding the deference given to the findings of the juvenile court under the rule stated earlier in this opinion, we cannot, in the words of the question phrased by the juvenile judge, conclude that Mrs. Hochstetler's eccentricity causes such chaos and stress in the family life as to make it harmful to the emotional health of the children.

Parents frequently embarrass their children, just

as children frequently embarrass their parents. There is no support for the conclusion that the embarrassment caused the children has in any material way affected their well-being. Although Mrs. Hochstetler may well be paranoid, there is no showing that such condition endangers the life, health, or morals of her children. The disputes between Mrs. Hochstetler and Jo Hannah are the usual disputes between a mother and a maturing daughter. The shortage of fuel and food toward the end of the month and the lack of a stable residence are the unfortunate but pervasive characteristics of our poor.

The right of parents to maintain custody of their children is a natural one, subject only to the paramount interest which the public has in the protection of the rights of a child. *In re Interest of M.*, *ante* p. 383, 338 N.W.2d 764 (1983).

The record in this case establishes only that Mrs. Hochstetler is a woman who refuses to defer to those with whom she must deal and does not behave like the majority of society. Nowhere is there authority to deprive her of the custody of her children solely on that account.

We conclude the record fails to establish that the children fell within then § 43-202(2)(c) or (e). Accordingly, the juvenile court never acquired jurisdiction over the children such as to permit it to place custody of them in the Department of Public Welfare once Mrs. Hochstetler was released from jail.

The judgment of the District Court affirming the juvenile court must be reversed and the action dismissed.

REVERSED AND DISMISSED.

GRANT, J., dissenting.

I respectfully dissent from the holding of the majority reversing the action of the District Court in this case. I feel a more detailed statement is necessary.

The county attorney of Greeley County, in his

third amended petition, alleged that the three children named in the petition were in the sole custody of their mother, appellant Beverly J. Hochstetler, until May 8, 1981; that after such date the children were, by court order, in the custody of the Nebraska Department of Public Welfare; that the father of such children had been determined in a Hall County District Court adjudication, and that the father had abandoned the children; that said minor children are minors as defined in Neb. Rev. Stat. § 43-202(1), (2)(b), (c), and (e) (Reissue 1978); that appellant was mentally ill and as a result, but through no fault of appellant, the said children were without proper support and should be placed in the custody of the state Department of Public Welfare; that appellant, by reason of her fault, has neglected or refused to provide proper and necessary subsistence and other care necessary for the well-being of the children; and "that she has caused the children to be placed in a situation which is injurious to the health or morals of such children in that the children are deprived of heat in the winter and on occasion food, they are traumatized by stories and threats of the mother and they are deprived of a stable home environment . . . ."

The county attorney prayed that the children be declared to be children as defined in § 43-202(1), (2)(b); (c), and (e); that the children be placed in the custody of the state Department of Public Welfare; that the parental rights of both appellant and the children's father be terminated; and for such other relief as was in the best interests of the children.

Appellant's answer to this petition was a general denial.

The county court thereafter held hearings on July 28, August 12, September 29 and 30, October 1, and November 3, 1981. Pursuant to appellant's motion in limine, all evidence before December 3, 1979 (the date of dismissal of a prior juvenile court case in Merrick County) was excluded. Eight hundred

forty-five pages of testimony were taken and 40 exhibits were submitted.

The county court by journal entry of adjudication hearing on September 29, 1981, found: "By a preponderance of the evidence that [the children] . . . are each within the meaning of 43-202(2)(b) who lack proper parental care by reason of the fault of Beverly J. Hochstetler, (c) whose parent, Beverly J. Hochstetler, neglects and refuses to provide proper or necessary care for the mental health, morals, and well-being of said children, and (e) who are in a situation injurious to the mental health and morals of said children."

The county court further found that the State had failed to prove that appellant was a mentally ill or mentally deficient parent.

The court ordered a home study of appellant's home and ordered appellant to meet with Michael O'Neill, Ph.D., a psychologist and director of the Family/Child Center in Grand Island; ordered Dr. O'Neill to develop a treatment program "structured and designed with the goal of reuniting Beverly J. Hochstetler with her children"; and set a dispositional hearing for November 3, 1981.

The dispositional order placed temporary custody of the children with the state Department of Public Welfare in a designated foster home, and with detailed directions as to the conduct of the children and appellant, until further review set for June 4, 1982, or such earlier date as might be requested.

It is from this order that the appellant appealed to the District Court, where the county court order was affirmed on March 1, 1983.

It should be noted, as to appellant, that there was no termination of parental rights and no permanent deprivation of custody. The parental rights of the father were terminated earlier, in the county court proceeding, and no appeal was taken from that order.

I agree that the findings of fact of the juvenile

court should be accorded great weight by this court, as set out in the majority opinion. I further agree that the physical needs of the children were being met by appellant, i.e., that the children were fed and housed adequately. I do not think that is the issue decided by the juvenile court.

That court specifically held that appellant "refuse[d] to provide proper or necessary care for the *mental* health, morals, and well-being of said children, and [that said children] are in a situation injurious to the *mental* health and morals of said children." (Emphasis supplied.)

I feel there is overwhelming evidence to support those findings. This particular case began when appellant was arrested in May of 1981 for exercising control over property owned by another. At that time the children, of necessity, were placed in the custody of state officials for a period of some 20 days while appellant was jailed. Appellant's conviction of that crime, after jury trial, was affirmed in this court in *State v. Hochstetler*, 214 Neb. 482, 334 N.W.2d 455 (1983). The facts in that case showed that appellant had sold property owned by her landlord, valued at well in excess of $1,000, to another person for $140. It is of interest to note that among the conditions of probation enforced on appellant in that case was one requiring that appellant " 'refrain totally from acting as her own lawyer, and . . . from representing herself as an attorney or a proctor.' " *Id.* at 483, 334 N.W.2d at 456.

Typical of appellant's testimony throughout this case is the following example from the hearing on July 28, 1981: "Q. [By the court] Your husband's name or X-husband's [sic] name--- A. I'm a widow. My husband's name was Jonathan Lester Hochstetler. Q. When did he pass away? A. January 4, 1972. Q. And at the time he passed away you were married to him? A. Yes. Q. And is he the father of the three children? A. Yes. Q. John Hochstetler? A. Yes. Q. Now who are you re-

ceiving child support from? A. As I tried to explain earlier, the only setup that they had in the district court in Grand Island for any payments of any kind is through—is under either alimony or child support. Mr. Moses asked me which one I wanted it to come under and I said neither one because neither one applies so it's alimony. This man had done a great injury to my husband and he was suppose [sic] to pay money to him monthly. Q. But John— This man who's paying this alimony or whatever you call it; was he ever married to you? A. No. Q. And he is not the father of your three children? A. No. Their father is dead." Later examination by the children's guardian ad litem shows: "Q. (by Mr. Wheeler) You stated that John Hochstetler is the father of these children, is that right? A. John Lester Hochstetler. Q. Lester? And you're his widow? A. Yes. Q. He died January 4, 1972? A. He was killed in Viet Nam."

Certified copies of pleadings and orders from the Hall County District Court were then introduced in evidence. These pleadings show that appellant herself filed a sworn complaint naming as the father of the children the same man whose parental rights were terminated in this case. Appellant's petition resulted in a court determination as to the father of the children, and a child support order.

After the documentary proof of the adjudication of paternity and order for child support were marked as exhibits, appellant, still under oath, explained that the support payments were really just payment to her by a man who "had injured both my husband and myself," and that because of that injury appellant was required to go through the support payment procedure to get paid, and that Judge Weaver had told her she might say it was child support. It seems to be clear that appellant does not always function in the world of reality. It should be noted that appellant's confusion between fantasy and

reality is one of the very matters that concerned the examining psychologist.

Later in the trial, Lester Hochstetler testified that he had been married to appellant from September 28, 1956, until their divorce on March 31, 1964, and that he had never been in Vietnam. His appearance indicated he was not dead. Other documentary evidence proved, beyond any doubt, that he was not the father of the children.

Other evidence shows, as recited in the majority opinion, that appellant had told her children that Lester Hochstetler was their father, but admitted otherwise when the children discovered the facts in 1975 or 1976. Such statements were direct lies to her children concerning their parentage and are, in my judgment, deplorable. But when they are repeated, under oath, some 5 or 6 years later, to a judge faced with difficult decisions as to those very children, then such statements attain the rank of patent perjury—and indicate either that appellant is perfectly willing to play fast and loose with the virtue of truth or is so calloused mentally that she does not know the difference between boldfaced lies under oath and the plain truth.

Further examples of similarly untruthful or perjured testimony are scattered throughout appellant's testimony and in exhibits received. As examples, appellant told the landlord where she had arranged to rent a home for these children, during the course of these proceedings, that she was an attorney working on several cases and had recently received a $6000 court settlement. This conduct, of course, is the type of conduct that the court was trying to restrain in defendant's probation in *State v. Hochstetler*, 214 Neb. 482, 334 N.W.2d 455 (1983).

Other examples of appellant's bizarre conduct are set out in the majority opinion. Such conduct, both in court and out, goes far beyond excusable eccentricity and, in my judgment, constitutes suffi-

cient evidence in itself to make a court wary of entrusting these children to her.

Other evidence supports the findings of the juvenile court to an even greater extent. A physician who cared for the oldest child testified that, in his opinion, the ulcer that the child had was stress-related and flared up over visits with appellant. This same physician testified that, in his medical opinion, "From the information that I have and from the examinations of the children, I feel it would not be in their best interests to be returned to the home environment of their mother." This physician also testified that it would be detrimental to the children emotionally as well as physically to be placed back with their mother.

Other testimony from the clinical psychologist, Dr. O'Neill, who evaluated the children on three occasions, and who evaluated appellant, concluded that "it would be destructive for all concerned for them to try to be together at this point." This psychologist recommended treatment for all concerned and later review in 6 months or longer. It should be noted that this same witness thought it would be harmful to the children to terminate appellant's parental rights.

The testimony of the children need not be set out, but it may be said fairly that the children do have some love for their mother but that they dislike the life she requires them to live, and that, as a result, at least the two older children have expressed their desire that they not be required to live with their mother. I believe that the trial court gave appropriate weight to that love. And, of course, it would be perfectly appropriate to love Don Quixote, and yet not be willing to let him rear his own children—at least until he got through his windmill phase.

In summary, I believe that, giving proper weight to the findings of the juvenile court, this court should affirm the findings and order of that court. I think that court and all people involved with appellant

have done a commendable job in dealing with a most difficult problem, in spite of the efforts of appellant to enjoy herself at the expense of all who come in contact with her.

I would hold that § 43-202 (and the statutes that have supplanted it) concerns both mental and physical health and that there can be at least as great mental abuse of a child as physical abuse. Children should be protected against mental abuse as well as physical.

I would state that the result I reach is in no way dependent on the circumstance that appellant is unfortunately not a rich person. I restate that the record does establish that appellant has cared for the physical needs of the children in at least a minimal way.

I would affirm the order of the District Court which affirmed the order of the juvenile court.

BOSLAUGH and HASTINGS, JJ., join in this dissent.